I'm Robert Jobe, and I'm appearing today on behalf of the petitioners, Harpal Singh Cheema and Rajwinder Kaur. Although you'd never know it from the briefing, the facts of this case are not in dispute. The Board of Immigration Appeals ultimately deemed petitioner's testimony credible, and this Court must therefore accept as true the facts set forth in that testimony. The problem is not that we have a dispute over the facts. The problem is that from the very beginning, these undisputed facts have been mischaracterized, first by the immigration judge, then by the Board of Immigration Appeals, and now by counsel for the government. A case in point. The Board's conclusion that Ms. Kaur is a terrorist rests on a single sentence in her testimony. Specifically, Ms. Kaur testified that she and her husband had, on one or two occasions, that's a quote, sent money to women that were widowed or to children that were orphaned. That's on page 2448 of the administrative record. Now, what did the Board do with that testimony? First, they said, well, Ms. Kaur testified that she sent money to Sikhs in India. Well, that's sort of true. But then they characterized it as she sent money to various Sikh groups in India. There's never any testimony about groups. And then they took it one step further and they said she sent money to various Sikh groups engaged in terrorism. All that from a single sentence where she said that on one or two occasions, my husband and I sent money to widows and orphaned children. The Board's conclusion on Ms. Kaur's case that she's a terrorist is simply not borne out by the record. There may have been something in that secret evidence that we haven't seen. We were locked out of the courtroom when they presented it. We have no idea what it contained. But it's not in the record as it exists before this Court. So now the BIA said that it rested its decision on the public non-secret evidence. Is that correct? That's what it said, Your Honor. So at least as to Ms. Kaur, we would have to take the sentence of testimony and see whether there was substantial evidence in the record, just like a normal INS case, whether that one sentence would support substantial evidence, the conclusion reached by the BIA. Is that correct? I agree with that. And only if there is substantial evidence in the record would we turn to the due process issue about whether or not the Board was influenced by the secret evidence. But I want to now go back to some of the other mischaracterizations of the evidence, because the Board did know better with regard to Mr. Chima's case. In its brief to this Court, the government says 11 times, 11 times, that Mr. Chima connected militants or terrorists to Daljeet Singh Bittu. In fact, the government says in its brief that Mr. Singh, quote, admitted connecting militants to Daljeet Singh Bittu. Now, this is truly incredible, because Mr. Singh said no such thing. You can scour the record, and you will not find him admitting that he connected militants to Daljeet Singh Bittu. What he said was he connected journalists, he connected human rights workers, he connected Daljeet Singh Bittu's parents to Daljeet Singh Bittu. He testified that there was only one occasion where he connected a militant to Daljeet Singh Bittu, and that was during the Radu kidnapping, and that was in the Radu kidnapping. And the record is undisputed on this point. Both the immigration judge and the Board of Immigration Appeals agreed that in doing so, in connecting that one phone call during the Radu kidnapping, Mr. Chima was attempting to not facilitate the kidnapping, but put an end to it. He connected this single person in an effort to get Daljeet Singh Bittu to put pressure on the kidnappers to release the victim. The Board said that. The immigration judge said that. It's undisputed. Although it's undisputed, the government continues to argue in its brief to this court that Mr. Singh somehow facilitated the kidnapping of Daljeet Singh Bittu. Well, that goes contrary to both what the immigration judge found and the Board. Well, on that point, though, I thought what they found was that he had provided material support by soliciting funds for individuals or organizations, but that the BIA specifically found that they didn't find him significantly involved in anything to do with the kidnapping. That's exactly right. On the solicitation point, again, it's a complete mischaracterization. Mr. Chima testified repeatedly he never provided funds to Daljeet Singh Bittu, Panjwar, or their respective organizations. He testified explicitly, and this is on page 1556 of the administrative record, that he never encouraged anyone to send money to Daljeet Singh Bittu, Panjwar, or their respective organizations. The fundraising issue boils down to this. If you really look at the administrative record, what he admitted to doing was occasionally he said people would ask him, people would come to him and say, I want to send money to Daljeet Singh Bittu or Panjwar. How do I do it? And Mr. Chima told them, I can't do it for you. I can give you the phone numbers. You contact them. You talk to them directly. That's all he admitted to doing. The question on the fundraising, then, is whether or not that act of solicitation, whether or not that act of solicitation constitutes material support for an organization or individual in conducting a terrorist activity. And I submit to you that it does not, because Mr. Chima testified that he doesn't know whether a single one of those persons ever sent money. People asked him for the phone number, but there's not one iota of evidence in this record that any of those individuals to whom he gave that phone number ever sent money. How can we say that he provided material support to an organization or material support in conducting a terrorist activity in particular, if there's not one iota of evidence to suggest that any of the individuals to whom he gave this phone number sent money? And I would also point out that the phone number, because it all comes down to him providing the phone number, the phone number was widely available. Mr. Singh testified, I call him Mr. Singh because all the Sikh Baptists in the world know him, Mr. Singh testified that all of the leadership in the United States, Canada, and Europe were in contact with Daljeet Singh Bittu. Many of the witnesses in this proceeding, many of whom are seated here today, were in contact with Daljeet Singh Bittu. They've not been arrested, they're not in immigration proceedings, they're not charged with being a danger to national security. Anybody could have gotten that number from any person, but Daljeet Singh is charged here with being a danger to national security because he gave away a phone number that was available that many, many, many people here in the United States and Europe had. Now, these mischaracterizations, I think, are critical to the outcome of this case, because although the petitioners bear the burden of establishing their eligibility for asylum, it is the government that has the initial burden of presenting a prima facie case of ineligibility, which indicates that the terrorism bars apply. The government can't meet its burden by simply showing evidence which may indicate or could indicate that the bars apply. The regulations require evidence which indicates that the bars apply. This is 208.13C22 and 208.16D2. So it's the government that has the initial burden of presenting a prima facie case of ineligibility. And I submit that they simply have not done that, and I'm not going to deny that. To make out a prima facie case, they must show that these petitioners afforded material support to an individual or organization in conducting a terrorist activity. Now, it's undisputed, for example, that Mr. Chima Singh connected journalists and human rights workers to Daljeet Singh Bintu, but that does not make the government's case that he was affording material support in Daljeet Singh Bintu. Now, they say he was soliciting funds. They say he was soliciting funds. Well, it's not borne out by the record. All he did was provide phone numbers to people, and we have no idea whether any of those people actually even sent funds. Now, the only other thing the board relied on is the fact they say he connected militants to Daljeet Singh Bintu. Again, it's not borne out by the record. Counsel, is it your position, then, that soliciting funds requires that there actually be a contribution? To solicit funds, no. I would agree that to solicit funds, you don't actually have to have a contribution made. But he didn't solicit funds. He said he never encouraged anybody to send money. His undisputed testimony is simply that people would come to him and ask him, how do I do it? He wasn't encouraging them to do it. He said, if you want to do it, I won't do it for you, I won't do it for you. So why would they come to him? Because he was a person in the leadership of this movement. He knows everybody, Your Honor. He knows members of Parliament. He knows the best, the most high-ranking and most prestigious human rights workers in India. He knows everybody involved in this movement, including these militants. People came to him to ask for the phone number, as I'm sure they did to other people in the leadership of the movement. But he never solicited funds. All he did was give the phone number away, and the issue there is whether or not he provided material support. While solicitation is a form of material support, this does not constitute material solicitation. So the issue is, does providing this phone number constitute material support? And I submit, it cannot be material if nobody ended up giving money. At least the government had the burden of establishing that somebody, one person, gave money to this organization, and they frankly failed to do that. If you would, you know, we have a fairly high hurdle, as you know, on the evidentiary and the conclusions drawn from the evidence. I'm interested in the terrorist definitions, and I know you wouldn't concede that he appropriately was classified as a terrorist, but just assume for talking purposes that that hurdle were established by the government. That he engaged in terrorist activities? Yes. That, of course, doesn't end the inquiry. Would you address what evidence there was or what we would be benchmarking against to see whether or not there in fact should be an exemption? Because you can't engage in terrorist activities, but still have an exemption. Yes. If there are not reasonable grounds for regarding him or her as a danger to national security, yes. First point I want to make in that regard is that the board's conclusion that these individuals are a danger to national security rests, again, on a misreading of the evidence. The board bases its conclusion on its belief that he was connecting militants to Daljit Singh Bidtu, not borne out by the record, and its belief that he was soliciting funds, again, not borne out by the record. But more important than that is the fact that these organizations themselves, that Mr. Chima is accused of affording material support for, and that Mr. Chima is accused of supporting, have not been designated as foreign terrorist organizations. Section 219 of the Immigration and Nationality Act permits the Secretary of State to designate any organization to be a foreign terrorist organization if it meets these three requirements. It has to be foreign, it has to engage in terrorist activity, and there has to be a finding that that terrorist activity affects the security of the United States. Now, the organizations at issue in this case, the Sikh Student Federation and Panjwara's Palestine Commando Force, are clearly foreign, they engage in terrorist activity, but neither one has been designated by the Secretary of State to be a danger to national security. Well, or neither one has been designated to be a foreign terrorist organization. Well, why? The only conclusion that we can draw is the Secretary does not believe either of these organizations to constitute a danger to national security. And if the organizations are not a danger to national security, then how can Mr. Chima's individual contribution to these organizations constitute a danger? And I would also point out that under IEPA, IEPA allows the President, and this is laid out in our brief as well, but IEPA allows the President to designate organizations to be a danger to the security of the United States. There are hundreds, if not thousands of organizations on that list. None of these organizations are on that list. It seems to me that that would be one grounds for matching the statue with the terrorist moniker by the Secretary of State. But also, if you read through all the national security statutes, they use language along the lines of, you know, national security and defense of the United States or foreign relations of the United States. So it would seem that you wouldn't need to be dealing with a terrorist organization to actually implicate that prong. Is there any evidence here about the United States foreign relations with India or how we view it or how this activity would implicate U.S. foreign relations? Is there any evidence in the record? There's evidence from Dr. Mahmood about to what extent these organizations constitute a threat to India at this point in time. And I would point out that the immigration judge found Dr. Mahmood's testimony to be credible, and in fact adopted her testimony as her findings of the country conditions. Dr. Mahmood testified that by 1995, the Sikh militant movement was virtually crushed. She said that since the crushing of the militant movement in 1995, the mood among supporters of Khalistan has changed and support for the use of violence has evaporated. This is in the judge's undisputed findings on page 440. She said at the present time, the Khalistan Commando Force has not been used by more than a few dozen fighters, and the movement is, quote, currently quiet. She said the organization that Mr. Chima was a member of, the Sikh Youth of America, is not a militant organization. She said it's outspokenly against any form of violence outside of India. And she went on to say that these Khalistani organizations in North America, quote, have not threatened any United States official at any time, or any Indian officials visiting the United States. She said the leaders of these Sikh organizations agree that the Khalistan movement needs the exile communities of the West as their strategic base, and they're aware that if any violence occurred outside of India, they'd be thrown out. The other thing that I want to point out about the national security question is that nothing Mr. Chima ever did was illegal. All of these activities occurred right here in the United States. Nothing he did was prohibited by American law. The government's going to say, well, even if there wasn't any criminal sanction against it, you know, it was a ground of deportability. Well, yeah, there was a ground of deportability relating to engaging in terrorist actions, but that ground required a showing, as it does today, that you're assisting or protecting the people of the United States who never believed that he was. And it's also very important in assessing this national security question, Your Honor, that at the time that Mr. Chima was engaged in these activities, he was of the view, and we were of the view, quite frankly, that his activities were protected by the First Amendment, because this court issued a decision in 1995 and reaffirmed it in 1997, Arab American Anti-Discrimination Committee, which held that fundraising for organizations, political organizations, even those that engage in violence, is First Amendment protected, and it can only be prohibited if the donor has specific intent to further the violence. And there's been no such suggestion in this case. So here we have a man who's accused of being a danger to national security, because he engaged in, he gave some phone numbers away, and he connected Daljit Singh Bittu's parents and journalists and human rights workers to Daljit Singh Bittu. None of his activities were illegal, and in fact, not only were they not illegal, unlawfully, but they were not illegal, and because of the jurisprudence of this court, which stood until the Humanitarian Law Project case reversed it in the year 2000, it was believed to be First Amendment protected. There's no way that you can find these lawful activities, which were seemingly First Amendment protected, to be evidence that he's a danger to the security of the United States. And finally, it's important to point out, these facts that the board just, you know, their analysis doesn't account for, Daljit Singh Bittu left the movement, went back to India to become a progressive farmer in 1992. Mr. Chima has not had contact with this man for now 11 years, not since February of 1992. And that is the bulk of the government's case, yet the board didn't even consider that fact. I think if you look at it, on the whole, you have to conclude that there is not substantial evidence to conclude that either one of these individuals constitutes a danger to the security of the United States. And that's a constitutional issue that the court forwarded. I can do that now or later. Why don't you go ahead and do it now? First, I want to say that the issue first begins with, do these petitioners have constitutional rights? The government's going to come in and they're going to point to Knopf and Mezzi and all these other cases that say that an applicant for admission has no constitutional rights with regard to that application for admission. Those cases do not address this situation. Every one of those cases involves an applicant for admission, discretionary admission, or an applicant for some discretionary form of relief. Not a single one of those cases involves an individual like Mr. Chima or Ms. Cower, who's applying not only for discretionary asylum, but non-discretionary withholding of deportation, protected by treaty. And the issue is whether or not these petitioners have due process rights to a full and fair hearing with regard to that non-discretionary application for relief. And I think the obvious answer is yes, they do. The government cannot give them a non-discretionary form of relief and then provide them with an unfair hearing. And that's borne out by this Court's decision in Arab American Discrimination Committee, because there the Court distinguished Jay v. Boyd and some of the other precedents involving the use of secret evidence, and they said, hey, those cases involve discretionary applications. They didn't involve non-discretionary applications. And when you have a non-discretionary application, individuals have First Amendment rights. They didn't address the specific situation of applicants for admission, but they said, as a general matter, for non-discretionary applications, there are constitutional rights. Once we get past that threshold, it's obvious that the use of secret evidence is unconstitutional. It violates due process, because it's patently unfair. But how does that play out in a circumstance where the Court then makes a determination on review that it will not use secret evidence, that it will only base it on the record that is non-secret evidence, which, of course, is the only record we have in front of us? Well, I mean, first off, the immigration judge relied on the secret evidence. And this is on page 498. She said, I'm going to draw inferences from the secret evidence and couple it with the unclassified. It goes up to the board, and the board says, we're only going to rely on the non-classified evidence. But the board didn't say, we're not going to look at the classified evidence. It just said, we're not going to rely on it for purposes of our decision. And what's compelling about the board's decision is that... How is that any different than courts all the time look at evidence that they don't ultimately rely on? And we always say, you ultimately have to trust the judicial system that there is this compartmentalization. How does that differ from any other case? Because we can't trust the board's decision in this case, and I'll tell you why. The immigration judge mischaracterized the evidence repeatedly. And even though there are blatant mischaracterizations that any simple review of the record would have revealed, the board parroted, they mimicked, oftentimes quoting those mischaracterizations. They used the exact same language as the immigration judge. The immigration judge said, for example, Daljeet Singh Bittu or Mr. Chima connected militants or terrorists to Daljeet Singh Bittu. It's not borne out by the record, but the board parroted that language over and over and over again, even though it's not borne out by the record. They did not review this record to make an independent determination about whether or not Mr. Chima connected militants. They simply parroted what the immigration judge said. And the immigration judge based her conclusions, in large part, on that secret evidence. Thank you. We'll hear from the government. Ethan Cantor, the Department of Justice, on behalf of the respondent in this case. After extensive proceedings involving 26 hearings, thousands and thousands of pages of testimony, the board ultimately concluded that the petitioners should be a forted protection under the Convention Against Torture. But it also concluded that they are precluded from relief under the asylum and withholding statute. So the issue before this court is whether the board correctly concluded that they were statutorily ineligible for this additional form of relief. When you say protection, what do you mean? I mean deferral of removal. And what does that mean? Deferral means that there are substantial grounds for believing that the petitioners, the board concluded, substantial grounds for believing that they would be subjected to torture in India. No, but what does it mean operationally in the United States? Operationally, it means that if conditions should change such that there are no longer substantial grounds for believing they'd be subjected to torture, then they can be removed to India. Freedom? Yes. Well, currently they're detained. One of the petitioners is detained. You call that protection, and it actually is imprisonment, is that correct? Well, they are inadmissible aliens who... It's imprisonment. The court can choose its own words. The statute does not, the statutory basis and the regulatory basis under which they are detained does not call it imprisonment. Well, let's put it this way. They're not free to walk around until such time as the conditions change and they get another hearing, correct? They basically will be detained unless or until the conditions change. No, no. Now we're under the new Supreme Court decision. No, the court is conflating two issues which are separate. This case before the court relates to simply whether they are statutorily precluded from the relief of asylum and withholding. This is not a detention issue before the court. Excuse me? Hear us out. We know we're not deciding the Convention Against Torture because that was decided in their favor. However, the simple question is, where are they now? They are in detention. One of the petitioners is in detention, yes. And so that means that he will remain in detention until or unless country conditions change, is that correct? Or unless and until the immigration authority exercises its discretion to release him. In other words, the detention matter is controlled by the parole statute, which is administered by the IMS, now DHS, district director. Mr. Singh is free to petition the district director should conditions have changed regarding his detention. Whatever he would like to put forward in his request for reconsideration of his release denial, he can do so. And that decision, as it has already been once reviewed by district court, and this court upheld the district court's affirmance of the IMS's denial of the release on parole. But that is a separate matter. I wonder if you could go directly to the question of how someone qualifies under this exception, someone found to have engaged in terrorism and is still eligible, and the board seemed to acknowledge there was such an exception, but then immediately said, well, on the same basis we find he's a terrorist, we find he's a danger to the security of the United States. Now, how do they justify it? Well, the exception to the terrorist activity bar is if the board were to find that there are not reasonable grounds for regarding him as a danger. How do you justify the board's decision? Because the board found that his material support for terrorist activity presented a danger to the national security. Will you spell that out? Yes, I would. The finding of material support for terrorism was based on provision of funds to terrorist leaders and organizations. We've heard all that, but how does it affect the security of the United States? Okay. Well, let me go straight to the facts and the evidence and the record. No, go to the danger to the United States, not the facts. Well, you know, we heard about the facts. What is the danger to the security of the United States in these facts? Well, I think the board... The board said it's obvious, but it's not obvious to me. Maybe it's obvious to you, and you could tell me what's so obvious. Well, it was interesting that in counsel's presentation to the court, he stated that Mr. Singh's expert witness stated that they would never harm the United States because they, quote, need the West as a strategic base. And that is precisely what the board found, Your Honor, that in coming here, they have used this country as a strategic base for supporting the actions of terrorist groups and terrorist leaders abroad. How is this a danger to the security of the United States? Please spell it out. Well, his expert witness also stated that at one time there were up to 200 such militants in the United States. And Mr. Chima, Mr. Singh, is a recognized leader of... What did they show in the association with him and those so-called militants? Well, the association between Mr. Singh and militants is one of a kind. It's pervasive throughout this record. Well, if it's pervasive, you might give us one illustration besides the spare facts that the board found. Yes. I will give an illustration of how Mr. Chima provided material support and communication support at the very same time that these terrorist groups, the KCF, the Khalistan Commando Force, its leader, Paramajit Panjwar, and Daljit Bitu and his terrorist organization were brought to the United States. Blowing up civilians. And I will give one example. The State Department reports in 1991 alone, 3,300 civilians were killed by Sikh terrorist groups, including the KCF and SSF. That's in one year. At this time, the record demonstrates that Mr. Singh was particularly active as a communications link. He testified at page 1043 of the administrative record that in 1991 alone, the KCF and SSF were killed by Sikh terrorist groups. Can I stop you just a second? I'm going to take all that as a given. Here's my legal problem, okay? Basically, the board says he's a terrorist, therefore he's a threat to the national security. And they basically equate and conflate the two. So I'm taking the BIA at its word, and I'm looking at the meaning of danger to national security under AEDPA. And there's three parts to it, which I know that Mr. Singh's counsel doesn't agree with. But they say you are a danger to national security if you endanger the lives, property or welfare of United States citizens. So I'm going to go through each one of these. Is there evidence in the record that Ms. Kaur or Mr. Singh have endangered the lives, property or welfare of United States citizens? Yes. What is that evidence? Well, the evidence is that they have, as the board held, they have brought the conflict to the United States. That creates the very real potential, on one hand, of harm to United States citizens here. How? Well, I mean, it would be easier for me to understand this if I had some testimony in the record where somebody said, you know, from the FBI or somewhere else that said, here's the situation, I deal with terrorist groups, here's how it works, here's how the concern is. All we have is basically the BIA jumping to the legal conclusion. Mm-mm. Well, the danger to national security provision, as the court has recognized, is broadly defined. National security threats are broadly defined to include economic, foreign relations and national defense. I'm getting there. I'm right now only on endangering the lives of the people in the U.S. Well, that's not the standard. That is not the standard that controls this court's review or this court's decision. The standard is, and I quote, reasonable grounds for regarding the alien as a danger to national security. Okay. You can argue with me all you want, but it was the BIA that made up the three-part standard based on AEDPA and said that's how they defined danger of security to the United States. Are you backing away from my part? No, I'm not backing away. The board discussed its standard in some two or three pages and included several factors. Okay. But, sir, your problem is you want to argue instead of answering the question. It's a real simple question. We're going to walk through each one of these factors, and I want to hear the evidence, which will only inert a benefit to the United States if we understand your evidence rather than arguing against us that we're somehow not understanding you. The first point was endangering the lives of the United States, and you're saying the conflict was brought to our shores and that would satisfy that prong. Is there any other evidence I should look to? Well, that creates a reason to believe that there is a danger. Bear in mind that the word danger is unqualified. It can be a danger of any degree or nature. Okay. Now, the second prong is it compromises the national defense of the United States. Is that a prong we should, and these are oars, so it doesn't have to meet each one of these. But is there anything we should look to to see if it matches up against that prong? Yes. India is a nuclear power, and these terrorist groups are attempting to destabilize that power. India is a significant ally. And what's the evidence in the record on that? See, I totally intuitively agree with you that basically India is supposed to be a democracy, it's a nuclear power, it's one with whom we have friendly relations. You know, I can say that all off the top of my head. My question is, did somebody testify, however, that given this political condition, that these activities would harm the foreign relations or economic relations of the United States? The petitioner's own expert witness testified that the Khalistan Commando Force remains, and this is testimony related to 1996 and 1997, remains a military threat to the government of India. As far as the facts that the court could take. Well, you know, the terrorists in Iraq, I mean, the underground in Iraq remained a threat to the Iraqi government. Until Saddam was toppled, so that's true all over the world. But does that translate automatically that it relates to our U.S. foreign relations? No, Your Honor, it doesn't translate automatically. However, Congress has given to the Attorney General the task to make that judgment call. As long as we're on foreign relations, isn't Pakistan an ally of the United States? Yes. And doesn't Pakistan have a different view of the situation than India? Meaning, that does not mean that terrorist groups operating against the government of India do not constitute a threat to our national security. Regardless of what Pakistan's view is. You are rather single-mindedly concentrated on what the reaction in India may be, though, Your Honor. You have no declaration of the government of India, do you? The government of India is not trying to extradite. What this court found in the Kozlowskis decision is that the State Department's country reports are perhaps the best evidence of country conditions abroad, including India. Those reports are in the record. All right. But now we have multiple countries to be considered. We have Pakistan. We also have the signatories of the Convention Against Torture, who might be deeply disappointed at the way we are interpreting that convention. And we have the United Nations, with whom we entered into an agreement as the refugees. So there are many different countries whose foreign relations have to be considered before we focus on just the reaction of the Indian government. And it is the job of the State Department and the executive branch to consider those questions. The State Department hasn't named any of these organizations as terrorist organizations. Oh, no, it has, Your Honor. The State Department, and this is in the pages surrounding Administrative Record 2841, has identified the Khalistan Commando Force as a terrorist organization, has identified the Sikh Student Federation, B2 faction, as a terrorist organization. When counsel states that a finding has not been made under Section 219 of the INA, which is completely separate, that that means necessarily that they are not terrorist organizations. The statute doesn't require the Secretary of State, under that provision, to find that all terrorist groups, that our terrorist groups are designated, and the ones that aren't are hereby deemed friendly organizations. The State Department, in this record, has extensively and exhaustively and authoritatively identified these organizations and these terrorist leaders as terrorists, not militants. Not militants. Yes. And I guess, you know, what still troubles me, and maybe you can answer this, is that it seems like the country report, it describes conditions. But the country reports don't give you a political analysis of U.S. foreign relations. In other words, they tell you what's happening in a particular country, at least all the ones I've read sitting here, through multiple countries and individuals applying for asylum. So my question is, wouldn't it be incumbent on the United States to produce some evidence and linkage that would give us a record in which we could say someone from the State Department or the FBI or the CIA, or somewhere, really tied this up vis-à-vis either national security or foreign relations? The Supreme Court has indicated that, in matters of foreign affairs and national security, that Congress, in designing the statutes, has necessarily painted with a broad brush to give the executive branch, the President, the Attorney General, the Secretary of State, broad leeway in making determinations with respect to threats to our national security and what impact. What impacts foreign relations is... I totally agree with that. ...inherently a political... ...that would play out the principle that you just said. I totally agree with the principle. We ought to defer to the State Department, to the executive, to the President in military and foreign and other things. But we don't have any record in which we do that. That's my question. What we have is a record of bloody murders of Indian civilians by these terrorist groups and terrorist leaders, and the board's finding exercising that broad discretion delegated to the Attorney General, that the petitioner's material support for those terrorist groups, his fundraising, serving as a communications link to the tune of, in one year, a $36,000 phone bill, that that constitutes a threat to our foreign relations and national security. What you have before you is the board, as the delegate of the Attorney General, making the determination, making the judgment call that these actions constitute terrorist activity and constitute a danger to our national security. Counsel, will you please respond to opposing counsel's argument that no funds were solicited, there were just numbers provided? Yes, I would, Your Honor. In the one example that I gave earlier with regard to 3,300 civilians killed in 1991. I will take that year as an example. That is the year in which the petitioner's phone bill was $36,000 at page 1043 of the administrative record, where he stated that calls came through to be connected to B-2 and Panjwar in Pakistan, and he connected them frequently and often without even asking who was calling. Secondly, with regard to fundraising, the petitioner himself testifies that he was the chief fundraiser. Quote, we have never lost an opportunity where we could have raised funds, page 1562 of the administrative record. This money went to militants, such as the KCF and Baba Khalsa. That's at page 1567 of the administrative record. Where the petitioner equates sending money to, quote, unquote, Pakistan, the question, what does that mean? And he stated, the militant groups, the Khalistan Commando Force. Mr. Singh's assistant, Bajan Singh Binder, stated, quote, Harpal, Mr. Singh's first name, was in charge of gathering funds for the KCF, and he had a personal discussion with the head of the Khalistan Commando Force about the KCF's need of money, guns, ammunition. Mr. Singh testified at page 1514 of the administrative record, quote, whenever gatherings take place, any place, any fundraiser, I spoke. I told them there's a duty to send money. If that is not solicitation, I don't know what is. All right. And I have one last question. Your time has expired, but I'm interested to know your position. One of the difficulties we always have in these records is there's quite a bit of time lag between events, testimony, and then the board decision. When the board makes its decision in 2002, should it be looking at whether the Singh's activities, Mr. Singh and Ms. Cowher's activities were a danger to the United States as of that moment or at some prior time? The board makes its decision on the basis of an administrative record that is in place, Your Honor, as well as any additional information that may have been presented to it. If the Petitioner presented additional information, it would do so in a motion to reopen before the board. The record, yes, there may be a lag in time between the board's decision, but, Your Honor, the board's decision is based on the fact that the board's decision is based on the administrative record in place. And that takes us up until, well, Mr. Singh stated that at page 1553 and 54 that he continued fundraising and conversations with Panjwar of the KCF up until September of 1997. Thank you. That's helpful. We don't want you to leave without addressing the use of the secret information. Yes. That issue is irrelevant because the board found that the board based its decision Well, that's your position, but please address it. Okay. I'd be happy to, Your Honor. The board stated in the second page of its decision that its decision was solely based on the unclassified record. This Court reviews the board's decision. You've made that point. Address the question I asked you instead of some other question. What of the use of secret information in a proceeding of this kind? What of it? It's authorized. Is it compatible with due process? Yes. It's authorized under the regulations. The regulation doesn't supplant the Constitution, does it? And the statute. The statute doesn't supplant the Constitution either. Well, inadmissible aliens have no due process interest with regard to No. This Court has held in the detention context, most specifically the Barrera-Echevarria case, that there is a dividing line between inadmissible aliens and deportable aliens, those who are seeking admission to the United States, as the petitioners are. As a legal matter, they are outside the United States seeking admission. Therefore, they do not have the constitutional due process interests that come with developing legal ties to this country. That is a fundamental distinction in this case. However, the issues move. The board didn't base this case on the fact that there is a dividing line between the two. It's not something we'll go into now. But I am troubled by the number of statements in your brief which the opposition has pointed out to as serious misstatements of fact. And, of course, we'll have to review that. But I want you to know now we will review it and see if you have or have not misstated the fact. And because of the allegation in opposing counsel's brief, which greatly disturbed me as well, because I take great exception to it, and I brought with me the excerpts of the record which demonstrate that the characterizations in my brief, in the government's brief, are accurate and they are true to the record, and I would be happy to hand these record excerpts to the Court if it wishes to look at them. Let me suggest this, is you can make copies of those here at the Court so that you can provide, at the same time you provide them to the clerk, you would provide them to opposing counsel as well. I would be most happy to do that. Thank you. We'll be happy to accept those. You may have two minutes for rebuttal. He was arrested by the Immigration Service in November of 1997. And because he's being treated as an excludable alien, he has no right to a bond hearing before an impartial arbiter. He's never had an immigration judge decide that he should be detained. He has no right to such a hearing. Now, the government says, well, yeah, you know, he could make a parole request and maybe they'll cut him loose. No. The regulations prohibit the government from releasing an individual who's a danger to the security of the United States, for obvious reasons. So the determination by the board in this case that he's a danger to the United States means that he will either give up his rights, go back to India and face torture for the fifth time, or he will spend the rest of his life behind bars here in the United States. Does the Sancerre decision give any relief to anybody in his situation, or is that because of the national security? It goes to the national security issue. And, see, the problem is that in terms of release, when the courts are reviewing Hague's petitions seeking release of an excludable alien, the standard of review is such that if the government offers a reason that's legitimate on its face, the courts will not look beyond it. As long as they say national security, that's it. That's the end of the story. Well, where is he actually in prison? I believe he's down in Bakersfield, Your Honor. It's an INS facility. He's been in the Oakland jail. Is that a federal facility? At the present time, he's in, I believe, an INS detention facility. But he's been in city jails. He's been in multiple, five or six different detention facilities. If we were to follow the government's argument, which is that if it's determined that he falls within the terrorist category, that it's then up to the government to make a decision. If we are to follow the foreign relations and national security, and hear the BIA act as the surrogate for the Attorney General, why wouldn't we defer to that determination? Well, a couple reasons. First, the board's determination is inconsistent, it's patently inconsistent with the determinations of the President and the Secretary of State who have declined to designate these organizations as constituting a danger to the United States. And we recognize that these organizations have engaged in what is classified as terrorist activities. No one's disputing that. And for the government to point out that, you know, bombings took place, et cetera, that helps us not at all. The question is whether that makes this individual a danger to the United States. So do we disregard that evidence in the equation? No, it's certainly relevant, Your Honor, but more relevant is the fact that these particular organizations have not been deemed to be a danger to the United States. It's not the case that the President, who has designated hundreds of organizations under IEPA, or the Secretary of State, which has designated 37. The BIA cannot make that determination absent a designation by another agency? No, I'm not suggesting that, but it's something the board should have taken into account. It didn't. Its equation here is, you sent money, you're a danger to national security. It's a lot more complicated than that. The board abused its discretion by simply saying, if you did this, if you did that, especially when these activities took place years and years ago, the State Department said these organizations are not a danger, et cetera. Now, if I could just on the... State Department say they were not a danger? But State Department has not deemed them to be a danger to the security of the United States. Yes. I agree with that. Thank you. I'm sorry the clock is a little confused, but your time is up.
judges: Noonan, McKeown, Rawlinson